# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

LATANYA D. RODGERS,            *
                              *
    Plaintiff,                *
                              *
vs.                           *    CIVIL ACTION NO. 24-00224-B
                              *
FRANK BISIGNANO,[1]           *
Commissioner of Social        *
Security,                     *
                              *
    Defendant.                *

## ORDER

Plaintiff Latanya D. Rodgers ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security denying her claims for a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and 1381, *et seq.* The Court has jurisdiction over this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) and 28 U.S.C. § 1331. On July 12, 2024, the parties consented to have the undersigned Magistrate Judge conduct any and all proceedings in this case. (Doc. 7). Thus, this action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with

---

[1] The Court takes judicial notice that Frank Bisignano is now the Commissioner of Social Security. Accordingly, pursuant to Federal Rule of Civil Procedure 25(d), the Clerk is **DIRECTED** to substitute Frank Bisignano, Commissioner of Social Security, as the Defendant in this case.

28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Doc. 8). Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

I.  **Procedural History**[2]

Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits on March 8, 2022. (Doc. 10 at 24, 249-50, 258-64). She also protectively filed a Title XVI application for supplemental security income on March 8, 2022. (Id. at 24, 249-57). Plaintiff alleged disability beginning December 5, 2020,[3] based on osteoarthritis, knee pain, back problems, asthma, high blood pressure, diabetes, and obesity. (Id. at 284, 289).[4] Plaintiff's applications were denied at the

---

[2] The Court's citations to the transcript in this order refer to the pagination assigned in CM/ECF.

[3] Plaintiff had previously filed Title II and Title XVI applications for a period of disability, disability insurance benefits, and supplemental security income in June 2019. Those claims were denied by Administrative Law Judge James F. Barter on December 4, 2020. (Doc. 10 at 73-87).

[4] To establish her eligibility for disability insurance benefits, Plaintiff had to prove that she suffered from a disability between December 5, 2020 (her alleged onset date), and December 22, 2023 (the date the ALJ issued his decision). See Mason v. Comm'r of Soc. Sec., 430 F. App'x 830, 831 (11th Cir. 2011) (per curiam); Sober v. Colvin, 2013 U.S. Dist. LEXIS 134101, at *3 n.5, 2013 WL 5290109, at *1 n.5 (N.D. Fla. May 19, 2013). The relevant period for deciding Plaintiff's claim for supplemental security income is March 8, 2022 (the date Plaintiff applied for SSI) to December 22, 2023 (the date the ALJ issued his decision). See Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam).

initial stage and upon reconsideration. (Id. at 88-127, 134-44, 148-62). Plaintiff requested a hearing before an Administrative Law Judge, and a hearing was held before Administrative Law Judge Daniel S. Campbell (the "ALJ") on October 30, 2023. (Id. at 51-72, 163-64). Plaintiff attended the hearing along with her counsel and provided testimony relating to her claims. (Id. at 51-67). Vocational expert Melissa Williamson (the "VE") also testified at the hearing. (Id. at 51-53, 67-71). On December 22, 2023, the ALJ issued an unfavorable decision finding Plaintiff was not disabled. (Id. at 21-38). On June 13, 2024, the Appeals Council denied Plaintiff's request for review, and the ALJ's decision thus became the final decision of the Commissioner. (Id. at 6-12).

Having exhausted her administrative remedies, Plaintiff timely filed the present civil action. (Doc. 1). The parties agree that this case is now ripe for judicial review and is properly before the Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.  Issue on Appeal

Whether substantial evidence supports the ALJ's residual functional capacity ("RFC") determination?[5]

## III. Factual Background

Plaintiff has a high school education and was 43 years of age

---

[5]  See also Section VII. A., infra.

at the time of her hearing before the ALJ.  (Doc. 10 at 36, 251, 290).  Plaintiff has one living child, a son.  (Id. at 259, 299-301, 313-315, 430).  Plaintiff last worked in 2019 as the second kitchen manager at Cottage Hill Baptist Church, while also working part-time at Logan's Roadhouse.  (Id. at 55-58, 289).  As noted, Plaintiff's reported medical conditions include osteoarthritis, knee pain, back problems, asthma, high blood pressure, diabetes, and obesity.  (Id. at 289).  Plaintiff has also been diagnosed with diabetes (which is under control) and high blood pressure (which Plaintiff reported was not adequately controlled as of the ALJ hearing).  (Id. at 66).  Plaintiff's back and knee issues have been treated with injections, oral pain medications, physical therapy, creams, ice bags, and a cane.  (Id. at 59-62).  Plaintiff's doctors recommended a whole right knee replacement (an increase from an earlier recommendation of a partial knee replacement), but the surgery has not been performed due to issues with anesthesia.  (Id. at 60).

Plaintiff testified that she is unable to work because of the debilitating pain in her back and knees (with the right knee more severe than the left knee) and the side effects from pain medication.  (Id. at 59-60, 64).  She further testified that she has to alternate between lying down, sitting, and standing because of the pain she experiences.  (Id. at 61-63).  Plaintiff testified that she has "to have a portable toilet that I have in my room

because trying to get up and get out of the bed, and grab my walker, it takes a long time to get to the restroom." (Id. at 63). Plaintiff reported that other people assist her by shopping and cooking for her and taking her to her medical appointments. (Id. at 63-64, 66-67). Plaintiff testified that she does not "have any activities," she does not go anywhere other than medical appointments, and she has "no outside life." (Id. at 66-67).

## IV. **Standard of Review**

In reviewing claims brought under the Social Security Act, this Court's role is a limited one. The Court's review is limited to determining (1) whether the decision of the Commissioner is supported by substantial evidence and (2) whether the correct legal standards were applied.[6] Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991). "Substantial evidence is more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as

---

[6] This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). In determining whether substantial evidence exists, a reviewing court must consider the record as a whole and take into account evidence both favorable and unfavorable to the Commissioner's decision. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam); Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (per curiam); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, at *4 (S.D. Ala. June 14, 1999).

## V.    Statutory and Regulatory Framework

An individual who applies for Social Security disability benefits must prove her disability. See 20 C.F.R. §§ 404.1512(a)(1), 416.912(a)(1). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining whether a claimant has proven her disability. See 20 C.F.R. §§ 404.1520, 416.920.

The first two steps of the evaluation require the claimant to prove that she (1) has not engaged in substantial gainful activity and (2) has a severe impairment or combination of impairments.

<u>Carpenter v. Comm'r of Soc. Sec.</u>, 614 F. App'x 482, 486 (11th Cir. 2015) (per curiam);[7] <u>see</u> 20 C.F.R. §§ 404.1520(a)(4)(i)-(ii), 416.920(a)(4)(i)-(ii).  If the claimant does not meet her burden on either of these two inquiries, she will be found not disabled. <u>Carpenter</u>, 614 F. App'x at 486; <u>see</u> 20 C.F.R. §§ 404.1520(a)(4)(i)-(ii), (b), (c), 416.920(a)(4)(i)-(ii), (b), (c).  If the claimant meets her burden at the first two steps, the evaluation proceeds to step three, where if the claimant proves that her impairment or combination of impairments meets or equals a listed impairment and satisfies the duration requirement, she will automatically be found disabled.  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1238 (11th Cir. 2004); <u>see</u> 20 C.F.R. §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d).

If the claimant cannot prevail at step three, the evaluation proceeds to the fourth step, where the claimant must prove an inability to perform her past relevant work.  <u>Jones v. Bowen</u>, 810 F.2d 1001, 1005 (11th Cir. 1986); <u>see</u> 20 C.F.R. §§ 404.1520(a)(4)(iv), (e), (f), 416.920(a)(4)(iv), (e), (f).  At step four, the ALJ must determine the claimant's residual

---

[7] Federal Appendix cases are unpublished Eleventh Circuit opinions and are not considered binding precedent, but they may be cited as persuasive authority.  <u>See</u> 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."); <u>Henry v. Comm'r of Soc. Sec.</u>, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

functional capacity ("RFC"). <u>Phillips</u>, 357 F.3d at 1238. A claimant's RFC is an assessment, based on all relevant medical and other evidence, of a claimant's remaining ability to work despite her impairments. <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997); <u>see</u> 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC assessment is used to determine whether a claimant can perform past relevant work at step four, and if necessary, to determine whether a claimant can adjust to other work at step five. <u>Phillips</u>, 357 F.3d at 1238; <u>see</u> 20 C.F.R. §§ 404.1520(e), 416.920(e).

If the claimant meets her burden at step four, the burden temporarily shifts to the Commissioner to prove at step five that the claimant is capable of performing other work that exists in significant numbers in the national economy, given the claimant's RFC, age, education, and work experience. <u>Goode v. Comm'r of Soc. Sec.</u>, 966 F.3d 1277, 1278-79 (11th Cir. 2020); <u>see</u> 20 C.F.R. §§ 404.1520(a)(4)(v), (g), 416.920(a)(4)(v), (g). If the Commissioner makes this showing, the burden then shifts back to the claimant to prove her inability to perform those jobs in order to be found disabled. <u>Goode</u>, 966 F.3d at 1279.

## VI. <u>The ALJ's Findings</u>

In this case, the ALJ found that Plaintiff has not engaged in substantial gainful activity since her alleged onset date of December 5, 2020. (Doc. 10 at 26). The ALJ found that Plaintiff has the severe impairments of degenerative disc disease of the

lumbar spine, degenerative joint disease of the bilateral knees (with the right knee being worse than the left knee), diabetes mellitus, and obesity, as well as the non-severe impairments of hypertension and asthma. (Id. at 26-27). However, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (Id. at 27).

The ALJ found that Plaintiff has the RFC to perform a range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a),[8] with the following additional limitations: she can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps or stairs; she cannot work at unprotected heights or around other significant workplace hazards; she can occasionally operate foot controls with the left lower extremity but cannot operate foot controls with the right lower extremity; she requires the use of a single-point handheld assistive device to assist with ambulation; she can frequently balance; she can occasionally

---

[8] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

stoop; she can never kneel, crouch, or crawl; she cannot work in temperature extremes; and she is expected to be off-task approximately five percent of the workday in addition to normal breaks. (Id. at 28-29, 35).

Based on the testimony of the VE and the record before him, the ALJ found that Plaintiff cannot perform her past relevant work as a head cook but can perform other jobs that exist in significant numbers in the national economy, such as surveillance system monitor, order clerk, and charge account clerk. (Id. at 36-37). Thus, the ALJ determined that Plaintiff is not disabled. (Id. at 37-38).

## VII. Discussion

### A. Summary of Plaintiff's Challenges to the ALJ's Findings

On appeal, Plaintiff generically contends that "[t]he residual functional capacity delineated by the [ALJ] is not supported by substantial evidence, is contrary to the [Plaintiff's] treatment records, and essentially substituted the [ALJ's] own medical opinion." (Doc. 11 at 5). As Plaintiff acknowledges, the ALJ found that Plaintiff's RFC "is supported by the relatively successful treatment with regard to her impairments, the activities of daily living that are inconsistent with her reports, the modest clinical signs or diagnostic findings documented in the record, the conservative nature of the treatment recommend[ed], the inconsistencies noted in her medication use at

times documented in the record, the effectiveness of her medications when they have been taken, the lack of treatment sought more frequently from free or reduced cost care sources, and the opinion of the state agency physicians."   (Doc. 10 at 36). Although Plaintiff's attack on the ALJ's RFC decision is quite broad, her brief focuses on the ALJ's findings, namely: (1) the inconsistencies noted in Plaintiff's medication use at times as documented in the record, which Plaintiff argues was due to the cost of treatment; (2) Plaintiff's pursuit of conservative treatment regarding her knee even though surgery was presented as an option, and Plaintiff's contention that "she has to have a clear for anesthesia prior to surgery"; and (3) the ALJ's cherry-picked findings with respect to the November 2022 consultative examination performed by Cynthia Jackson, CRNP.  (See id. at 4-5).

### B. Plaintiff's Failure to Brief Constitutes Waiver

At the outset, the Court notes that Plaintiff's brief, which consists of only five pages of text, fails to provide legal argument for the issues that she raises on appeal.[9]  She also fails to include record citations for many of her statements of fact. The failure to brief an issue warrants affirmance on that basis of that issue on appeal.  See Sorter v. Soc. Sec. Admin., Comm'r, 773

---

[9]  Plaintiff cites a single case from the United States Court of Appeals for the Seventh Circuit.  (See Doc. 11 at 3).

F. App'x 1070, 1073 (11th Cir. 2019) (per curiam) ("As an initial matter, Sorter has abandoned on appeal the issue of whether the ALJ adequately considered her testimony regarding the side effects of her pain medication because her initial brief simply mentions the issue without providing any supporting argument.") (citing Singh v. U.S. Att'y Gen., 561 F.3d 1275, 1278–79 (11th Cir. 2009) (explaining that "simply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue")); Bookman v. Comm'r of Soc. Sec., 490 F. App'x 314, 317 n.2 (11th Cir. 2012) (per curiam) ("[T]he failure to make arguments and cite authorities in support of an issue waives it.") (quoting Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1319 (11th Cir. 2012)); Prater v. Kijakazi, 2022 U.S. Dist. LEXIS 129246, at *2, 2022 WL 2869852, at *1 (N.D. Fla. July 21, 2022) (concluding that claimant "abandoned all her issues on appeal because she failed to brief them or cite to any authority to support her arguments"). Thus, based on the complete lack of legal citations and developed arguments in Plaintiff's brief, any issues based on substantial evidence, cost, and/or anesthesia risk are deemed waived. Moreover, the sole case citation in Plaintiff's brief is insufficient on its own to support her challenge to the ALJ's findings regarding the November 2022 consultative examination by Cynthia Jackson. The ALJ's RFC determination and finding of non-disability were supported by numerous medical reports over time

(not just the November 2022 exam). Thus, the ALJ's decision was supported by substantial evidence.

### C. Plaintiff's Appeal Fails on the Merits

Notwithstanding Plaintiff's failure to adequately develop her arguments, the Court will nevertheless address the merits of her claims.

### 1. Medical Evidence - Substantial Evidence Supports ALJ's RFC Assessment

Having reviewed the record at length, the Court finds that Plaintiff's claim is without merit. At step five of the sequential evaluation process, the Commissioner bears the burden of proving that Plaintiff can perform other work available in the national economy after considering the claimant's RFC, age, education, and work experience. Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178 (11th Cir. 2011); Goode, 966 F.3d at 1278-79. To find that a claimant is not disabled under this step, an "ALJ must articulate specific jobs that the claimant is able to perform, and this finding must be supported by substantial evidence, not mere intuition or conjecture." Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002) (per curiam). An ALJ may rely on the testimony of a vocational expert as substantial evidence in making a step five determination, provided that the ALJ poses a hypothetical question to the vocational expert which comprises all of the claimant's impairments. Biestek v. Berryhill, 587 U.S. 97, 105

(2019); <u>Wilson</u>, 284 F.3d at 1227.

The ALJ began his RFC analysis by noting Plaintiff's reported health issues and their reported effects on her. The ALJ noted that Plaintiff "initially alleged that she cannot work due to osteoarthritis, knee pain, back problems, asthma, high blood pressure, and diabetes (Exhibit B2E)." (Doc. 10 at 29). The ALJ noted that Plaintiff "alleges that she can 'barely stand for long periods of time' and that she has pain when bending or squatting," "that she has to take breaks and that it is 'unbearable for me to do everyday things such as walk, cook, grocery shop' although she acknowledges childcare for her son, including cooking him breakfast," that "it is difficult to sleep due to pain and numbness but reported getting up at 6am," and that "she has to be in bed 75% of the day due to her back pain." (<u>Id.</u>). As for her medications, the ALJ noted Plaintiff's report that "that they 'make it completely impossible for me to work' (Exhibit B5E/6-7)." (<u>Id.</u>). The ALJ stated: "Although initially reporting several medications for pain, [Plaintiff] acknowledged taking only one oral medication for her blood pressure and one oral medication for diabetes (Exhibit B2E)," but "her more recent forms also include Losartan [for her blood pressure] (Exhibit B14E)." (<u>Id.</u>).

Regarding her daily activities, the ALJ found that Plaintiff reported that "she uses the alarm on her phone to remind her to take medications, she prepares meals daily, she can sometimes clean

and do laundry if her son helps," "she can shop for groceries both online and in stores," "she does not drive but can walk when she leaves the home," "she does not have a license," she "leav[es] the home at least three times a day," "she reads and watches television, although her medications reportedly cause drowsiness," "she can visit with family members when they come to her home," she "stated that she can only lift five pounds before pain starts and can only walk 'a little ways' before having pain in her leg, back, and knees," she is "able to follow both written or oral instructions sufficiently and getting along well with others," and "she can pay attention 'all the time' and even walk thirty minutes before needing to rest (Exhibit B5E/11 and B4E/7)." (Id. at 29-30). The ALJ noted that Plaintiff's previous reports were modified and/or augmented by her testimony during the hearing, when Plaintiff testified that "she can only walk thirty steps," "she takes breaks if she has to walk further," "she could stand up only a little longer than she does now in the past," "there is no comfortable position, but she . . . [lays] down extensively," "she actually has to utilize a portable toilet in the bedroom rather than making it to the bathroom," "she has to have help even moving around the home from family members that drop by or her son," "she has back pain when cooking and that others do this for her," "she can use the microwave for pre-cooked items," "when shopping, she found it difficult even to utilize a motorized cart," and "she

15

doesn't leave the home other than for doctor's appointments." (Id. at 30).

Regarding medication, the ALJ noted that Plaintiff testified that "her pain medications come from Dynamic Pain and Wellness," while her "injections were both from USA Orthopedics and Dynamic Pain and Wellness." (Id.). Additionally, the ALJ noted that Plaintiff "testified that she believed that her diabetes was controlled by the medications prescribed," (id.), which he found was consistent with her A1C being reduced to 5.8 in July 2022. (Id. at 31).

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms;" but Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Id. at 30).

In reaching his conclusion that "the medical evidence ultimately does not support [the] degree of limitation [Plaintiff] has alleged," the ALJ made numerous findings regarding Plaintiff's left and right knee and back. (See id. at 30-36). Those findings include:

(1) "[T]he only records that stretch back to the alleged onset date show treatment at the Stanton Road Clinic for the claimant but no indication of specific considerations of her knee or back. She had normal range of motion and full strength, as well as no tenderness or swelling at an examination in November 2019 (Exhibit

B1F/45 and B11F/8)."

(2) Plaintiff "did complain of knee pain in January 2021 but 'mild' osteoarthritis was evident at that point although there was a recommendation for weight loss and prescription medication. She complained of knee pain that had been present just a few months (Exhibit B11F/13). The x-ray showed findings only in the medial and lateral compartments, but it was present on both sides, although again, characterized by the x-ray as mild (Exhibit B11F/19)."

(3) "[A]t the follow-up in February 2021, [Plaintiff] stated that her pain was improved" with physical therapy but "report[ed] it returned later in the day and even that it was severe to the extent it limited her mobility and independence."

(4) In June 2021, Plaintiff sought "treatment at the [emergency room] for back pain with concerns that she could be pregnant also. [Plaintiff] had full range of motion and no spinal tenderness. Her balance and gait were normal. Moreover, although her back pain was believed to be potentially related to current menstruation, the claimant was advised to follow-up with her primary care provider (Exhibit B7F/35-38)."

(5) In late June 2021, Plaintiff's visits with Dynamic Pain and Wellness began. (8) Plaintiff had a lumbar MRI performed in August 2021 as the result of lower back complaints, with "the findings show[ing] that she had only mild lumbar spondylosis with moderate left L2-3 and mild/moderate bilateral L5-S1 neuroforaminal stenosis. There was no significant spinal canal stenosis at that point (Exhibit B3F)."

(6) Plaintiff "had a knee injection in August 2021. This reduced her pain from 8/10 to 6/10 (Exhibit B4F/94)."

(7) Plaintiff "reported back pain in September 2021 that was 7/10 (Exhibit B4F/85)" "prior to a medial branch block for her back."

(8) "Radiofrequency ablation [RFA] in October [2021] brought that pain rating down to 5/10 (Exhibit B4F/74)." Plaintiff "was informed that relief may take several weeks from the RFA; moreover, at this [follow-up] visit in October 2021, her treatment notes also continue to state that the claimant's current treatment and medication regimen allows for increased ability to perform ADLs."

(9) "An epidural in November 2021 showed a reduction in pain

from 8/10 to 6/10 (Exhibit B4F/48).  Moreover, . . . throughout some of this period, the records also show that the higher dosage of Norco was provided.  However, even most importantly, she also has clarified that the rating of 8/10 in several records, when reported, was prior to taking her pain medications (Exhibit B4F/20).”

(10) “[W]ith regard to [Plaintiff's] back pain, as recently as June 2022, she had one procedure that reportedly reduced her back pain 100% for several days before it retu[r]ned (Exhibit B6F/8).”

(11) “For her knee, even in July 2022, she had intact strength and was referred to an orthopedic specialist, but the treatment notes state that the complaint of limited mobility and the reduction in her range of motion were the basis of this referral. She had intact sensation to touch, and a diabetic foot examination was normal (Exhibit B11F/50).”

(12) “[A]t the next visit to Stanton Road Clinic [in September 2022], although they reportedly filled out paperwork associated with her disability claim then, the examination included normal range of motion, normal strength, no tenderness or swelling.  The claimant had an intact neurological examination and was assessed as being in no acute distress.  She did continue to rate her pain 9/10 (10/10 before); however, the record also indicated that she obtained a bus 'mobility assistance application' for the local transit authority (Exhibit B11F/57-62).” (

(13) Plaintiff had “a number of recent visits to an orthopedic specialist that began in October 2022 . . . .”  “The first visit [on October 6, 2022] included a description of her knee x-ray as moderate tricompar[t]mental osteoarthritis and, as also noted at the consultative examination, an effusion.”  At that time, an “osteotomy procedure was not advised, in lieu of unicompartmental knee arthroplasty as a considered option.  She had to be referred to another doctor (Exhibit B22F/28).”

(14) “Clinically, these visits in October 2022 note that she had a negative straight leg raising test, intact sensation, some range of motion in her knee limited by pain, but stability to both valgus and varus stress documented.  She also had intact strength (Exhibit B22F/19, 24).”

(15) In November 2022, Plaintiff was sent for a consultative physical examination to Cynthia Jackson, CRNP.  “[D]uring that visit [Plaintiff] reiterated as was noted during the testimony

that she was independent with regard to feeding and bathing[,] only requiring assistance with [dressing], cooking, cleaning, and shopping. [Plaintiff] acknowledged being able to sit thirty minutes, stand fifteen minutes, lifting/carrying five pounds, and walking for ten minutes at one time." Plaintiff "noted that she did stop working only in 2021. [Plaintiff] reported taking a number of medications[,] including the higher dosage of Hydrocodone-Acetaminophen, Gabapentin, and also a muscle relaxer as well as prescription topical treatments." Plaintiff "exhibit[ed] an antalgic gait but used no assistive device. [Plaintiff] did have pain associated with the attempt to perform a straight leg raising test; however, the examiner noted this as a failure to assess rather than a positive finding. She noted that [Plaintiff] grimaced and had a reported inability to lift her legs off the examination table (presumably with regard to this task in supine position rather than sitting[)]. Regardless, the examiner noted that [Plaintiff] can transfer on and off exam table with assistance and that she had 5/5 upper extremity muscle strength. [Plaintiff] had only diminution to 4/5 in the lower. There was no muscle atrophy noted; no tenderness, increased warmth, redness, effusion, or thickening of shoulder, elbow, wrist or ankle joints." Plaintiff "was unable to stand on heels, toes and tandem walk due to unstable stance and coordination. [Plaintiff] cannot squat and rise according to the report. Likewise, she had 2 bilateral knee joint crepitus with mild effusion of left knee and tenderness of lateral surface of the bilateral knees (Exhibit B13F)."

(16) "[T]he January 2023 visits with the orthopedic specialist indicate that [Plaintiff] had referrals for bariatric surgery, prescription Voltaren gel, and continued plans with pain management. When she returned months later, [Plaintiff] still requested to continue conservative treatment. Largely the only change was continuing Voltaren gel. She remained stable to both valgus and varus stress in both knees. She also had no signs of dislocation or subluxation. There was still only small effusion on the right and none on the left. She did ultimately consent to surgery if needed at that point (Exhibit B22F/3)."

(17) Plaintiff's medical records "show that she had an injection in the SI joint in April 2023 and that it did reduce her pain from a self-rated 9/10 to a 7/10." (21) Also, she had "an early 2023 injection in the knee as well as an epidural in the lumbar spine as recently as June 2023." That "epidural was rated as reducing her pain from a 9/10 to a 7/10 even post-procedure. The knee injection was also noted as a measure to prolong her need for a knee replacement. Moreover, throughout it is noted that her

19

lower extremity strength is 5/5 and that she did have an antalgic gait, but repeatedly no assistive device (Exhibit B23F).”

(18) “In September 2023, viscosupplementation injections were offered for her right knee, although other non-surgical management was also offered. [Plaintiff] wanted to proceed with surgery.” “[T]his visit documents just a small knee effusion and ongoing stability with regard to valgus and varus stress. [Plaintiff] had 5/5 strength against resistance; however, the x-ray referenced most recently (April 2023) noted moderate tricompartmental arthritis (Exhibit B24F)” and

(19) “Even most recently, [Plaintiff’s] last visit to USA orthopedics to another new provider did finally note scheduling of a total knee arthroplasty. She did have painful range of motion and positive joint line tenderness. However, the right knee had no effusion[, and] . . . the right knee was the planned side for surgery. The updated x-ray continued to show mild tricompartmental arthritis in the knee (Exhibit B26F).”

Based on the foregoing, the ALJ found that “[t]he record clearly shows that she has had lessening conservative treatment for both her knee and her back, including the referrals for surgery most recently. Still, the ability to continue to prolong the wait for her knee replacement, the remaining partial effectiveness of both medications and injections simply does not show that the restriction beyond the diminished range of sedentary work above would be required. And, again, the self-assessment ratings of pain were repeatedly intended to characterize her pain without use of any medications according to the Dynamic Pain and Wellness Records.” (Id. at 30-34).

The ALJ made further findings regarding Plaintiff’s medications, noting: “Dynamic Pain and Wellness records show that [Plaintiff] had reportedly had an epidural already prior to that

20

point [August 2021] some years before without further explanation. [Plaintiff] did state that it was not effective.  However, these records note evidence of monthly visits with these providers as well as use of narcotic pain medications immediately, although prescribed only every twelve hours, as needed (Exhibit B4F).  In fact, the most recent notes actually indicate that she will be weaned off the narcotics long term, she still only takes Norco 5mg, every twelve hours [although 7/5 had been noted on occasion], as needed, and that they would continue to use the lowest possible effective dose.  Furthermore, in contrast to her testimony that the medications cause drowsiness that is incapacitating and are ineffective, [the medical records indicate that] she denied excess sedation or even constipation associated with the use of opiates. [Plaintiff had] a drug screen as the doctor noted that she had been deemed a high-risk patient in the past.  His results showed her to be positive for cannabinoids and opioids, although she is prescribed Norco and Gabapentin.  A number of visits listed negative findings for opiates and positive for cannabinoids.  This was considered inappropriate, but notably at least one visit was not expected to find opioids as she had not filled her prescription in early January 2023 (Exhibit B23F/7, 88, 99)."  (Id. at 31-32).

The ALJ stated that "[w]hile recurrent epidurals and other injections into [Plaintiff's] back and knee have been documented, the record continues to note at least partial effectiveness, which

is consistent with the ongoing recommendation to continue and her consent to do so." (Id. at 32). The ALJ noted that Plaintiff "testified that she had injections in her back, but she stated that these were postponed due to Medicaid coverage." (Id. at 31).

Focusing on Plaintiff's hearing testimony regarding her medications and her knee, the ALJ found that Plaintiff testified "that she does not believe that she can work with her pain medications themselves (illuding to side effects) in spite of notes even recently that there were no side effects in Exhibit B23F; nonetheless, she has now for a number of years, obtained only very conservative treatment with no significant adjustment or even clear and consistent increase in her medications. [Plaintiff] testified that she has little to no relief with the medications but only in the previous few months was surgery even identified as a definitive plan to engage with a surgeon, and only for her one, right knee. [Plaintiff] testified that she had injections but did not address the effectiveness of those at the hearing. The records do show that they were not long-lasting, although she had a relatively few number of injections in several places, only three in 2023, all in the back. She testified that her oral medications work 'just a few minutes.' She testified that even currently, she has not had surgery scheduled still, although the most recent records show that it will occur." (Id. at 34).

The ALJ specifically noted that Plaintiff's attorney

suggested in the hearing "that there was a prohibiting factor to surgery related to anesthesia, [but Plaintiff] testified that they have not told her anything about anesthesia. Perhaps the note in Exhibit B11F/25 and her self-report to the orthopedic surgeon does note some concerns over general anesthesia but, importantly, at that earlier point, [Plaintiff] had been totally untreated for her diabetes also. The surgeon provided no specifics to suggest concerns with the surgery (which, again, is now reportedly scheduled). Nonetheless, the record does specifically show progression of her treatment because she did have a recommendation for a cane or walker, although even this was only in April 2023. At two subsequent visits, [Plaintiff] was purportedly using just a cane 'sometimes' although she did have a moderate limp (Exhibit B22F). Even the most recent records with the orthopedic specialist document that the claimant only recently has been considered to have failed non-operative management with regard to her knee. She is now offered knee replacement for the right and, while knee tenderness is present, extensive portions of the record note that the claimant had deferred surgery for conservative management, that her doctor did so, or that the claimant simply preferred to continue conservative management through that point. At the hearing, [Plaintiff] confirmed that she still utilizes only the single-point cane. She stated it helps at little bit but 'not enough.' She stated that a recommended knee brace has not been

obtained due to financial cost, but the records show no indication
she raised this issue. She confirmed that this brace also was
only offered earlier this year." (Id.).

The ALJ also took into account Plaintiff's "obesity and the
combined effects of obesity with [Plaintiff's] other impairments,"
including Plaintiff's diabetes and non-severe hypertension. (Id.
at 35).

Based on the record as a whole and on all of his findings,
the ALJ concluded that Plaintiff would only be capable of sedentary
work with restrictions. (Id.). The Court is satisfied that the
record evidence detailed above constitutes substantial evidence to
support the ALJ's determination that Plaintiff's statements
regarding the severity, frequency, and duration of her symptoms
were inconsistent with the record. See Puryear v. Saul, 2021 U.S.
Dist. LEXIS 78347, at *22-23, 2021 WL 1603237, at *10 (S.D. Ala.
Apr. 23, 2021) ("[A] 'clearly articulated credibility finding with
substantial supporting evidence in the record will not be disturbed
by a reviewing court.'") (quoting Foote, 67 F.3d at 1562).

The Court is also satisfied that the record evidence detailed
above constitutes substantial evidence to support the RFC for a
range of sedentary work, with the stated restrictions. Residual
functional capacity is a measure of what Plaintiff can do despite
her credible limitations. See 20 C.F.R. §§ 404.1545, 416.945.
Determinations of a claimant's RFC are reserved for the ALJ, and

the assessment is to be based upon all the relevant evidence of a claimant's remaining ability to work despite his or her impairments and must be supported by substantial evidence. See Beech v. Apfel, 100 F. Supp. 2d 1323, 1331 (S.D. Ala. 2000) (citing 20 C.F.R. § 404.1546 and Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)); Saunders v. Astrue, 2012 U.S. Dist. LEXIS 39571, *10, 2012 WL 997222, *4 (M.D. Ala. March 23, 2012).  Once the ALJ has determined the claimant's RFC, the claimant bears the burden of demonstrating that the ALJ's decision is not supported by substantial evidence.  See Flynn v. Heckler, 768 F.2d 1273, 1274 (11th Cir. 1985).  Plaintiff has failed to meet her burden in this case.  Substantial evidence supports the ALJ's RFC determination and the ALJ's ultimate finding that Plaintiff was not disabled because she could perform other work available in the national economy, and Plaintiff's claim must fail.

### 2. Inconsistencies v. Cost

Plaintiff contends that the inconsistencies noted by the ALJ regarding her inconsistent medication use at times were due to the cost of treatment.[10]  Plaintiff identifies two specific instances

---

[10] Although Plaintiff affirmatively represents that "[i]t is mentioned throughout the record that Claimant is limited in her income to what she can afford as far as treatment," Plaintiff fails to provide record citations for such evidence beyond a single cite related to a knee brace which Medicaid did not cover. (See Doc. 11 at 4).  Similarly, Plaintiff avers, without citing any evidentiary support, that "[t]reatment for pain management is not offered at a low cost or at the health department, a specialist is

in which she contends the ALJ's findings are faulty because they do not take into account whether Plaintiff could afford the available treatments:

> On April 24, 2023, Claimant's orthopedist stated, "I did recommend she proceed with a cane or a walker. We did discuss possible medial offloading brace secondary to her varus alignment however secondary to her Medicaid status she would be unable to afford this." PageID.1200. The Administrative Law Judge stated in his decision, "She stated that a recommended knee brace has not been obtained due to financial cost, but the records show no indication she raised this issue." PageID.58. Further, the Administrative Law Judge stated, "Given the extreme nature of her testimony with regard to being virtually incapacitated by pain, the long gap in treatment with the orthopedic specialist for her knee as well as the absence of extensive ongoing injections or other attempts to obtain treatment at Dynamic Pain and Wellness for her knee and her back are simply an inconsistency the claimant has not explained." PageID.57. Claimant has clearly explained this "inconsistency" by explaining that she cannot afford treatment.

(Doc. 11 at 4).

In his discussion regarding Plaintiff's right knee, the ALJ found that the medical records "show progression of her treatment" from conservative to more aggressive, observing that, despite

---

required for this treatment." (Id.). Failure to include citations to the record results in waiver. Morrison v. Comm'r of Soc. Sec., 660 F. App'x 829, 832 (11th Cir. 2016) (per curiam) ("To preserve an issue for appeal, the party must raise the specific issue to the district court so that the district court has an opportunity to consider the issue and rule on it. Generally, this means that the issue must be plainly and prominently raised, with supporting arguments and *citations to the evidence* and to relevant authority.") (citing Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014)) (italics added) (other citation and internal quotation marks omitted).

long-term knee complaints, she was only recommended for a "cane or walker" in April 2023, whereas by the time of the hearing in October 2023, Plaintiff had been recommended for a full right knee replacement. (See Doc. 10 at 34 ("Even the most recent records with the orthopedic specialist document that the claimant only recently has been considered to have failed non-operative management with regard to her knee. She is now offered knee replacement for the right [knee.]")).

The ALJ also found that Plaintiff "stated that a recommended knee brace has not been obtained due to financial cost, but the records show no indication she raised this issue." (Id.). Plaintiff challenges this particular finding by the ALJ, accurately noting that the medical records of Plaintiff's orthopedist do indicate that cost of the knee brace was a factor which precluded Plaintiff's use of same: "We did discuss possible medial offloading brace secondary to her varus alignment however secondary to her Medicaid status she would be unable to afford this." (Id. at 1176). Thus, the ALJ's finding that Plaintiff's ability to afford a knee brace was not previously raised is contradicted by the record. However, such error was harmless, because the ALJ's finding that Plaintiff was not disabled was not premised on Plaintiff's inability to purchase a knee brace. See Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) (per curiam) ("[T]he ALJ's determination that Ellison was not disabled

was not significantly based on a finding of noncompliance" due to failure to take his seizure medication. Rather, the ALJ "based his finding of 'not disabled' on testimony of a VE and Ellison's RFC, age, educational background, and work experience. Accordingly, . . . the ALJ's failure to consider Ellison's ability to afford his seizure medication does not constitute reversible error.") (citations omitted).

Here, the ALJ's determination that Plaintiff was not disabled was not significantly based on Plaintiff's conservative treatment and failure to obtain all types and frequency of treatment. Rather, the ALJ's determination that Plaintiff was not disabled was based on the totality of Plaintiff's treatment, the testimony of the VE and Plaintiff's RFC, age, educational background, and work experience. Moreover, there is substantial evidence to support the ALJ's determination that Plaintiff had the RFC to perform sedentary work with restrictions. The ALJ noted that Plaintiff only used a single point cane sometimes and that the brace suggestion, which was made only a few months prior to the recommendation that her right knee be fully replaced, was one of many possible forms of treatment over the course of time. Accordingly, the ALJ's failure to recognize cost as factor with respect to the knee brace was no more than harmless error.

Plaintiff also suggests that cost was the reason why there were gaps in receiving pain management injections. (Doc. 11 at

4).[11]  Specifically, Plaintiff argues that the ALJ should have considered her ability to afford treatment as a factor when evaluating Plaintiff's treatment history. (Id.). Having reviewed the record at length, the Court finds that Plaintiff's claim is without merit.

The Court is satisfied that the ALJ did not err in his findings regarding Plaintiff's opting for conservative treatment and/or failing to obtain the type and frequency of treatment. SSR 16-3p[12] allows ALJs to consider a claimant's use of conservative treatment and failure to obtain the type and frequency of treatment as a *factor* in assessing the claimant's *subjective complaints* about the effects of her pain and other symptoms. SSR 16-3p provides, in pertinent part:

---

[11] Although Plaintiff asserts that "[i]t is mentioned throughout the record that [Plaintiff] is limited in her income to what she can afford as far as treatment" (Doc. 11 at 4), Plaintiff's brief contains only one record citation (to Doc. 10 at 1176) to support her argument that Plaintiff's treatment decisions were driven by cost. Nevertheless, the Court notes that Plaintiff testified that (1) "Medicaid doesn't cover [the single point cane she used] so I had to get a family member to purchase it for me." (Doc. 10 at 60); (2) she did not get the medial offloading knee brace because she could not afford it (id. at 61);  and (3) at one point she tried to schedule an appointment to get another pain medicine injection in her back, but was told by the doctor's office that "due to Medicaid only covers 14 visits a year then I will have to wait for next year to get more shots because I used up all my treatment." (Id.).  In light of Plaintiff's testimony (*albeit uncited*) as to her inability to afford certain treatments, the Court addresses the issue of cost herein.

[12] SSR 16-3p rescinded and superseded SSR 96-7p.  See SSR 16-3p, 2017 WL 5180304 (S.S.A. Oct. 25, 2017).

We will consider an individual's attempts to seek
medical treatment for symptoms and to follow
treatment once it is prescribed when evaluating
whether symptom intensity and persistence affect
the ability to perform work-related activities for
an adult. . . . Persistent attempts to obtain
relief of symptoms, such as increasing dosages and
changing medications, trying a variety of
treatments, referrals to specialists, or changing
treatment sources may be an indication that an
individual's symptoms are a source of distress and
may show that they are intense and persistent.

In contrast, *if the frequency or extent of the
treatment sought by an individual is not
comparable with the degree of the individual's
subjective complaints,* or *if the individual fails
to follow prescribed treatment that might improve
symptoms, we may find the alleged intensity and
persistence of an individual's symptoms are
inconsistent with the overall evidence of record.
We will not find an individual's symptoms
inconsistent with the evidence in the record on
this basis without considering possible reasons he
or she may not comply with treatment or seek
treatment consistent with the degree of his or her
complaints*. We may need to contact the individual
regarding the lack of treatment or, at an
**administrative** proceeding, ask why he or she has
not complied with or sought treatment in a manner
consistent with his or her complaints. When we
consider the individual's treatment history, we
may consider (but are not limited to) one or more
of the following: . . .

• An individual may not be able to afford treatment
and may not have access to free or low-cost medical
services. . . .

The above examples illustrate possible reasons an
individual may not have pursued treatment.
However, we will consider and address reasons for
not pursuing treatment that are pertinent to an
individual's case. We will review the case record
to determine whether there are explanations for
inconsistencies in the individual's statements
about symptoms and their effects, and whether the

> evidence of record supports any of the individual's statements at the time he or she made them. We will explain how we considered the individual's reasons in our evaluation of the individual's symptoms.

SSR 16-3p, 2017 WL 5180304, at *9-10 (footnote omitted) (italics added).

Here, the ALJ did not base his finding of non-disability on Plaintiff's conservative treatment and failure to obtain the type and frequency of treatment; rather, the ALJ discounted Plaintiff's subjective complaints about the effects of her pain and other symptoms due to the inconsistency between those complaints and her failure to follow prescribed treatment.[13]

As discussed, SSR 16-3p provides that the Commissioner "will not find an individual's symptoms inconsistent with the evidence in the record [due to failure to pursue treatment or to follow prescribed treatment] without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." SSR 16-3p, 2017 WL 5180304, at *9. Here, Plaintiff claims that the ALJ failed to consider her inability to afford her prescribed treatment of more frequent injections for her knee and back as good cause for her opting to use conservative treatment. A review of the record

---

[13] Considering the ALJ's decision as a whole, it is apparent that Plaintiff's failure to obtain pain injections and epidurals more frequently was a factor in evaluating her subjective complaints but was not the basis for the ALJ's denial of disability.

supports, at least to some extent, Plaintiff's claim that some of her failure to obtain all possible types and frequency of treatment options may have been due to her inability to afford the prescribed treatment.  For example, Plaintiff's hearing testimony reflects that she tried to schedule an appointment to get another pain medicine injection in her back, but was told by the doctor's office that "due to Medicaid only covers 14 visits a year then I will have to wait for next year to get more shots because I used up all my treatment."  (Doc. 10 at 61).

In his decision, the ALJ discussed Plaintiff's failure to get more frequent injections and epidurals, particularly in 2023.  For her part, Plaintiff does not identify the time period during which she maxed out the number of injections Medicaid would cover, and she does not speak to the number of injections that she obtained in 2023, the year the ALJ indicated as the time period Plaintiff failed to request frequent injections or epidurals.  Moreover, Plaintiff has not presented any specific evidence regarding the alleged limit on yearly visits, such as whether the limit applies to a single provider or multiple providers, or whether there are separate limits applying to different areas of treatment.  The ALJ was free to consider Plaintiff's failure to obtain all types and frequency of treatment options with respect to those aspects of her treatment regimen in assessing the consistency of Plaintiff's subjective complaints against the objective record evidence.

With respect to the ALJ's failure to address the effect of lack of funds on Plaintiff opting for conservative treatment and failure to obtain the type and frequency of treatment regarding injections and epidurals, the Court finds, under the circumstances of this case, that any error in that regard is harmless. <u>See</u> <u>Miller v. Colvin</u>, 2016 U.S. Dist. LEXIS 100901, at *32, 2016 WL 4097097, at *10 (S.D. Ala. Aug. 2, 2016) (errors are harmless if they do not prejudice the claimant) (citing <u>Battle v. Astrue</u>, 243 F. App'x 514, 522 (11th Cir. 2007) (per curiam)).

In the instant case, although Plaintiff's conservative treatment and failure to obtain the type and frequency of treatment was a factor in the ALJ's assessment of Plaintiff's subjective complaints, there is no indication that it was a controlling factor. To the contrary, in assessing the consistency of Plaintiff's subjective complaints with the record evidence, the ALJ considered several other factors, such as Plaintiff's use of oral pain medications, clinical findings regarding her antalgic gait, 4/5 muscle strength in the lower extremities, and imaging results (showing mild osteoarthritis, mild lumbar spondylosis, mild and/or moderate tricompartmental arthritis, mild effusion, *etc.*), and the fact that full knee replacement was only recommended in 2023 (i.e., the absence of objective medical evidence to support Plaintiff's allegations of totally incapacitating symptoms and disabling loss of functional capacity). (<u>See</u> Doc. 10 at 30-36).

Ultimately, the ALJ concluded that the *objective medical evidence of record* indicated that Plaintiff's statements regarding the severity, frequency, and duration of her symptoms were overstated.  The Court is satisfied that the foregoing factors considered by the ALJ, which were based on objective record evidence, were the controlling factors in the ALJ's determination that Plaintiff's subjective complaints were inconsistent with the substantial record evidence in this case.  Therefore, because Plaintiff's conservative treatment and failure to obtain the type and frequency of treatment was not a controlling factor in the ALJ's assessment of Plaintiff's subjective symptoms, the ALJ's alleged failure to consider Plaintiff's ability to pay as an additional good cause reason for her not obtaining more frequent injections and epidurals is at most harmless error. See Nelson v. Kijakazi, 2021 U.S. Dist. LEXIS 175483, at *17, 2021 WL 4177203, at *6 (S.D. Ind. Aug. 20, 2021), report and recommendation adopted sub nom.*,* Nelson v. Saul, 2021 U.S. Dist. LEXIS 174140, 2021 WL 4171045 (S.D. Ind. Sept. 14, 2021) (ALJ's error in not considering if there were good reasons why claimant declined repeat surgery and injections as related to his neck and shoulder pain before the ALJ concluded that foregoing this treatment indicated that his pain was not as great as alleged was harmless because this was just one of several factors that the ALJ considered when conducting the symptom evaluation analysis) (citing Kittelson v. Astrue, 362

F. App'x 553, 558 (7th Cir. 2010) (ALJ should have considered the reasons for claimant's lack of treatment; however, ALJ's error in credibility analysis is harmless when ALJ articulates other reasons for adverse credibility determination).

Moreover, the Court is satisfied that the objective record evidence detailed above constitutes substantial evidence to support the ALJ's determination that Plaintiff's statements regarding the severity, frequency, and duration of her symptoms were inconsistent with the record. See Puryear, 2021 U.S. Dist. LEXIS 78347, at *22-23, 2021 WL 1603237, at *10. Last, the Court is satisfied that the record evidence detailed above constitutes substantial evidence to support the RFC for a range of sedentary work, with the stated restrictions.

### 3. Anesthesia

Plaintiff suggests that the ALJ's observation that Plaintiff has repeatedly pursued conservative treatment and his finding that Plaintiff can perform sedentary work are connected and should be faulted because Plaintiff's failure to have knee surgery was apparently because she had not been cleared for anesthesia prior to surgery. (Doc. 11 at 4). As noted above, Plaintiff's orthopedist identified knee surgery first as an option, and most recently as the recommendation. Plaintiff appears to fault the ALJ for ignoring that "it is indicated several times that [Plaintiff] has to have a clear [sic] for anesthesia prior to

35

surgery." (Id.). Plaintiff's argument is faulty for multiple reasons. First, Plaintiff only identifies one instance (not "several times") in which the medical provider notes that Plaintiff needed to be approved for anesthesia before knee surgery could be performed. (See id. (citing Doc. 10 at 1176)). Second, the Court's review of the medical records indicate that Plaintiff experienced an adverse drug reaction immediately prior to an endometrial biopsy on February 17, 2021, which caused rigidity and decreased mobility in Plaintiff's neck and in turn made it impossible to intubate her for general anesthesia, causing the procedure to be cancelled. (Doc. 10 at 446-47).[14] Despite this incident, Plaintiff's subsequent medical records show that she has received anesthesia since February 2021 (see, e.g., id. at 1003, 1022, 1086), although it is not clear whether Plaintiff was given the drug which triggered the earlier adverse reaction. Third, Plaintiff herself testified that, although the orthopedist had decided to perform a total knee replacement on her right knee, her doctor had not identified any anesthesia issues which would indicate that she was not a good candidate for such surgery. (Id. at 60). Fourth, the ALJ specifically addressed the fact that it was Plaintiff's attorney who suggested the possibility that anesthesia was a

---

[14] Neither Plaintiff nor the ALJ cite to the medical records which explain Plaintiff's adverse reaction to a component of the anesthesia process.

prohibiting factor to surgery.  (Id. at 34).  The ALJ observed that although the record may "note some concerns over general anesthesia, . . . importantly, at that earlier point, [Plaintiff] had been totally untreated for her diabetes also," and that Plaintiff's current orthopedist "provided no specifics to suggest concerns with the [total right knee replacement] surgery (which, again, is now reportedly scheduled)."  (Id.).  Thus, the ALJ did not err in his consideration of the evidence regarding Plaintiff's need to be cleared from anesthesia prior to undergoing knee surgery.

Fifth, the ALJ is entitled to rely on Plaintiff's treating physician's implicit determination that Plaintiff is a suitable candidate for anesthesia due to the fact that the physician has scheduled Plaintiff for a full knee replacement, a surgery which will require general anesthesia.  Moreover, in the absence of an explanation or timetable in the medical records for when Plaintiff received such a clearance for anesthesia, any error on the part of the ALJ for noting that Plaintiff chose conservative treatment options even though surgery was an option was harmless.

#### 4. November 2022 Consultative Examination

Lastly, Plaintiff argues that the ALJ "cherry picked restrictions" and "mischaracterize[ed] some" from the November 2022 consultative examination by Cynthia Jackson, CRNP.  (Doc. 11 at 5 (citing Doc. 10 at 1044-51)).  This argument is without merit.

37

The entirety of Plaintiff's argument regarding the ALJ's characterization of the November 2022 examination is:

> The Administrative Law Judge stated that, "The claimant did have pain associated with the attempt to perform a straight leg raising test; however, the examiner noted this as a failure to assess rather than a positive finding." PageID.56. This is a complete mischaracterization of the findings[.] Ms. Jackson stated, "unable to assess straight leg raise due to increased pain, grimacing and inability to lift legs off the table." PageID.1073. This was not a failure to assess at all, in fact, Ms. Jackson was very descriptive of the problems [Plaintiff] had with the straight leg test.

(Id.).

The deficiency with Plaintiff's argument is that the ALJ did not "cherry pick" Ms. Jackson's findings. To the contrary, the ALJ essentially quoted Ms. Jackson's findings regarding the straight leg test. Ms. Jackson reported: "unable to assess straight leg raise due to increased pain, grimacing and inability to left legs off the table." (Id. at 1049). With regard to the November 2022 consultative exam, the ALJ noted: "The claimant did have pain associated with the attempt to perform a straight leg raising test; however, the examiner noted this as a failure to assess rather than a positive finding. She noted that the claimant grimaced and had a reported inability to lift her legs off the examination table (presumably with regard to this task in supine position rather than siting.[)]." (Id. at 32).

These close comparisons show that the ALJ did not selectively

describe the section of Ms. Jackson's report to which Plaintiff points.  In addition to accurately quoting the examiner's report, the ALJ also summarized the remainder of Ms. Jackson's report and included his findings regarding the whole report in his decision. The Court thus concludes that the ALJ did not commit any error (harmless or otherwise) regarding Ms. Jackson's findings as to Plaintiff's straight leg raise test.

**VIII.    Conclusion**

No reversible error having been shown, the Court finds that the Commissioner's final decision denying Plaintiff's application for benefits is therefore due to be affirmed.  For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claims for a period of disability, disability insurance benefits, and supplemental security income be **AFFIRMED.**

**DONE** this **30th** day of **September, 2025.**

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**